JEROME CAMPBELL
302 North Lawe Street
Appleton, Wisconsin 54915

        Plaintiff,

        v.                              Case No. 1:13-cv-00415

GOLPER SUPPLY COMPANY, INC.      **JURY TRIAL DEMANDED**
1810 West Edgewood Drive
Appleton, Wisconsin 54913

JANE M. GEBERT
1379 Mulberry Lane
Neenah, Wisconsin 54956

FAYE M. CASSAI
1355 Commercial Street
Appleton, Wisconsin 54914

        and

DAVID B. GOLPER
460 Broadview Avenue
Highland Park, Illinois 60035

        Defendants.

## COMPLAINT

       COMES NOW the Plaintiff, Jerome Campbell, by his counsel, WALCHESKE & LUZI, LLC, by Attorneys James A. Walcheske and Scott S. Luzi, as and for a claim against Defendant, alleges and shows to the court as follows:

### Jurisdiction and Parties

       1.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this

case involves a federal question under 42 U.S.C. § 1981 and 28 U.S.C. § 1343 because this case involves an Act of Congress providing for the protection of civil rights.

2.  The unlawful employment practices of which Plaintiff complains occurred in Appleton, Wisconsin within the Eastern District of Wisconsin, Green Bay Division, and therefore, and for the reasons stated below, venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

3.  Plaintiff, Jerome Campbell, is an Adult male resident of the State of Wisconsin residing in Outagamie County with a post office address of 302 North Lawe Street, Appleton, Wisconsin 54915.

4.  Defendant, Golper Supply Company, Inc. ("Defendant Company" or simply "the Company"), was, at all material times herein, a Wisconsin corporation with a principal office address of 1810 West Edgewood Drive, Appleton, Wisconsin 54913.

5.  Defendant, Jane M. Gebert, was, upon information and belief and at all material times herein, an adult resident of the State of Wisconsin residing in Winnebago County with a post office address of 1379 Mulberry Lane, Neenah, Wisconsin 54956, and was employed by Defendant Company as Plant Operations Manager.

6.  Defendant, Faye M. Cassai, was, upon information and belief and at all material times herein, an adult resident of the State of Wisconsin residing in Outagamie County with a post office address of 1355 Commercial Street, Appleton, Wisconsin 54914, and was employed by Defendant Company as Bookkeeper.

7.  Defendant, David B. Golper, was, upon information and belief and at all material times herein, an adult resident of the State of Illinois residing in Lake County with a post office address of 460 Broadview Avenue, Highland Park, Illinois 60035, and was employed by Defendant Company in a managerial capacity.

8. Upon information and belief and at all material times herein, Leo Golper was Defendant Company's Owner and President.

9. Leo Golper died on or about June 1, 2012.

10. Upon information and belief, after Leo Golper's death on or about June 1, 2012, Defendant Golper became President of Defendant Company.

11. According to Defendant Company's website, www.golpersupply.com, it is a, "Dealer & Broker of all Paper Stock Fibres, Plastics, Bale Ties and Tying Wire."

12. Mr. Campbell has satisfied all conditions precedent, if any, prior to bringing this action.

### Mr. Campbell's Race, Dates of Employment, Positions Held, Duties Performed, Hourly Rates Earned, and Work Schedule at Defendant Company

13. Mr. Campbell's race is black or African-American.

14. Defendant Company hired Mr. Campbell in approximately April 2008 as a General Laborer earning $9.00 per hour.

15. Mr. Campbell's customary or usual hours of work as a General Laborer were Monday through Friday, 8:00 a.m. to 4:30 p.m.

16. Defendant Company did not provide Mr. Campbell with a written job description at any point in time during his employment.

17. On or about November 18, 2009, Byrian Fulton, another black or African American employee at Defendant Company, assumed the position of Supervisor.

18. Upon information and belief and in approximately November 2009, Mr. Campbell assumed the position of Assistant Supervisor at Defendant Company.

19. As Assistant Supervisor at Defendant Company, Mr. Campbell performed identical job duties as the Company's employees or staff who worked "on the floor" in the Company's

warehouse.

20.　　Defendant Company's employees or staff who worked "on the floor" performed manual labor and/or manual duties.

21.　　As Assistant Supervisor at Defendant Company, Mr. Campbell lacked the authority to hire, fire, demote, promote, transfer, or discipline any of the Company's employees.

## Defendant Company's Hierarchy Vis-à-Vis Mr. Campbell's Assistant Supervisor Position

22.　　Leo Golper's race was white or Caucasian.

23.　　During Mr. Campbell's employment at the Company, Mr. Campbell immediately reported to Mr. Fulton, who then technically reported to Leo Golper.

24.　　Defendant Golper's race is white or Caucasian.

25.　　Defendant Golper is currently the Company's President.

26.　　During Mr. Campbell's employment at the Company, Defendant Golper was employed by the Company in a managerial role.

27.　　Upon information and belief, during Mr. Campbell's employment at the Company, Defendant Golper reported directly to Leo Golper.

28.　　During Mr. Campbell's employment at the Company, Defendant Golper worked in an office setting.

29.　　During Mr. Campbell's employment at the Company, its employees or staff who worked "on the floor," including Mr. Fulton, brought work-related complaints or issues directly to Defendant Golper's attention.

30.　　Upon information and belief, during Mr. Campbell's employment at the Company, Defendant Golper had the authority to fire, demote, promote, transfer, or discipline its employees.

31.　　During Mr. Campbell's employment at the Company, Defendant Golper received

employee complaints about race discrimination and racial harassment in the workplace.

32.     Defendant Gebert's race is white or Caucasian.

33.     Defendant Gebert is currently employed at the Company as Plant Operations Manager.

34.     During Mr. Campbell's employment at the Company, Defendant Gebert held a supervisory role over Mr. Campbell and all of Defendant's employees who worked "on the floor."

35.     In its written submission to the Department of Workforce Development – Equal Rights Division dated February 27, 2012, the Company, specifically Defendant Cassai, stated that Defendant Gebert was a "Supervisor."

36.     During Mr. Campbell's employment at the Company, Defendant Gebert reported directly to Leo Golper.

37.     During Mr. Campbell's employment at the Company, Defendant Gebert worked in an office setting.

38.     During Mr. Campbell's employment at the Company, its employees or staff who worked "on the floor," including Mr. Campbell, brought work-related complaints or issues directly to Defendant Gebert's attention.

39.     During Mr. Campbell's employment at the Company, Defendant Gebert had the authority to fire, demote, promote, transfer, or discipline its employees.

40.     During Mr. Campbell's employment at the Company, Defendant Gebert received employee complaints about race discrimination, racial harassment, and retaliation in the workplace.

41.     Defendant Cassai's race is white or Caucasian.

42.     Defendant Cassai is currently employed at the Company as Bookkeeper.

43.     Defendant Cassai's position with the Company as Bookkeeper is a managerial

position.

44.　　During Mr. Campbell's employment at the Company, Defendant Cassai, in addition to her Bookkeeper position, also performed Administrative and Human Resources duties for the Company.

45.　　During Mr. Campbell's employment at the Company, Defendant Cassai worked in an office setting.

46.　　During Mr. Fulton's employment at the Company, its employees or staff who worked "on the floor," including Mr. Fulton, brought work-related complaints or issues directly to Defendant Cassai's attention.

47.　　During Mr. Campbell's employment at the Company, Defendant Cassai received employee complaints about race discrimination, racial harassment, and retaliation in the workplace.

### Nick Gebert and Chris Gebert's Employment with the Company

48.　　Defendant Gebert has three sons: Nick Gebert, Chris Gebert, and Andrew Gebert.

49.　　Nick Gebert's race is white or Caucasian.

50.　　Chris Gebert's race is white or Caucasian.

51.　　On or about June 1, 2000, Nick Gebert was hired by the Company as a Material Handler.

52.　　On or about September 8, 2006, Chris Gebert was hired by the Company as a Material Handler.

53.　　Upon information and belief, Defendant Gebert hired both Nick Gebert and Chris Gebert to work at the Company.

54.　　During the entirety of their employment at the Company, neither Nick Gebert nor Chris Gebert had written job descriptions.

55. During the entirety of their employment at the Company, neither Nick Gebert nor Chris Gebert had a customary or set work schedule.

56. During their employment at the Company, both Nick Gebert and Chris Gebert did not truthfully represent or record when they arrived to and left work.

57. During Nick Gebert's and Chris Gebert's employment at the Company, Defendant Gebert knew that both Nick Gebert and Chris Gebert did not truthfully represent or record when they arrived to and left work.

58. During Nick Gebert's and Chris Gebert's employment at the Company, Defendant Gebert knew that both Nick Gebert and Chris Gebert did not truthfully represent or record when they arrived to and left work, but nonetheless paid them for time not worked at the Company.

**Defendant Company's Employee Handbook and Lack of Any Policy or Practice Prohibiting Race Discrimination, Racial Harassment, and Retaliation in the Workplace**

59. At the time of Mr. Campbell's hire by the Company in approximately April 2008, it had an Employee Handbook.

60. The Employee Handbook that the Company had in place when it hired Mr. Campbell was the "2005 Edition," meaning that it was last revised, edited, or updated in the year 2005.

61. The Employee Handbook that the Company had in place at the time of Mr. Campbell's termination was the "2005 Edition."

62. During Mr. Campbell's employment at the Company, it did not edit, revise, or update its Employee Handbook.

63. During Mr. Campbell's employment at the Company, its Employee Handbook consisted of eight pages, including the title page.

64. During Mr. Campbell's employment at the Company, the title page of its Employee

Handbook stated, "Where the fun never ends!"

65.     During Mr. Campbell's employment with the Company, its Employee Handbook did not contain a policy prohibiting discrimination in the workplace.

66.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a policy prohibiting race discrimination in the workplace.

67.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a policy prohibiting harassment in the workplace.

68.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a policy prohibiting racial harassment in the workplace.

69.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a policy prohibiting retaliation in the workplace.

70.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a policy about how or to whom its employees should report discrimination, harassment, or retaliation in the workplace.

71.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a process, procedure, or policy about how employee complaints of discrimination, harassment, or retaliation in the workplace would be investigated.

72.     During Mr. Campbell's employment at the Company, its Employee Handbook did not contain a statement or policy regarding what consequences an employee of the Company could or would face if found to have engaged in discrimination, harassment, or retaliation in the workplace.

**Nick Gebert and Chris Gebert's Racial Discrimination and Racial Harassment against Mr. Campbell and Other Black or African American Employees at Defendant Company**

73.     Nick Gebert and Chris Gebert were employed at the Company during the entirety of

Mr. Campbell's employment with the Company.

74.     During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "nigger" on more than one occasion.

75.     Nick Gebert called Mr. Campbell a "nigger" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

76.     The word "nigger" is racially offensive.

77.     During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "dumb nigger" on more than one occasion.

78.     Nick Gebert called Mr. Campbell a "dumb nigger" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

79.     The phrase "dumb nigger" is racially offensive.

80.     During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "monkey" on more than one occasion.

81.     Nick Gebert called Mr. Campbell a "monkey" during Mr. Campbell's employment at the Company because Mr. Fulton's race was black or African American.

82.     The phrase "monkey," when referring to a black or African American individual, is racially offensive.

83.     During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "porch monkey" on more than one occasion.

84.     Nick Gebert called Mr. Campbell a "porch monkey" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

85.     The phrase "porch monkey," when referring to a black or African American individual, is racially offensive.

86.     During Mr. Campbell's employment at the Company, Nick Gebert imitated a monkey's physical sounds and gestures, in Mr. Campbell's presence, on more than one occasion.

87.     During Mr. Campbell's employment at the Company, Nick Gebert's imitations of a monkey's physical sounds and gestures, were directed at Mr. Campbell.

88.     During Mr. Campbell's employment at the Company, Nick Gebert imitated a monkey's physical sounds and gestures in Mr. Campbell's presence because Mr. Campbell was black or African American.

89.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "niggers" on more than one occasion.

90.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "niggers" because those black or African American employees, other than Mr. Campbell, were black or African American.

91.     During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "niggers."

92.     During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "niggers" because those white or Caucasian employees were not black or African American.

93.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "dumb niggers" on more than one occasion.

94.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "dumb niggers" because those black or African American employees, other than Mr. Campbell, were black or African American.

95.     During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "dumb niggers."

96.     During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "dumb niggers" because those white or Caucasian employees were not black or African American.

97.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "monkeys" on more than one occasion.

98.     During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "monkeys" because those black or African American employees, other than Mr. Campbell, were black or African American.

99.     During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "monkeys."

100.    During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "monkeys" because those white or Caucasian employees were not black or African American.

101.    During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "porch monkeys" on more than one occasion.

102.    During Mr. Campbell's employment at the Company, Nick Gebert called its black or African American employees, other than Mr. Campbell, "porch monkeys" because those black or African American employees, other than Mr. Campbell, were black or African American.

103.    During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "porch monkeys."

104. During Mr. Campbell's employment at the Company, Nick Gebert did not call its white or Caucasian employees "porch monkeys" because those white or Caucasian employees were not black or African American.

105. During Mr. Campbell's employment at the Company, Nick Gebert imitated a monkey's physical sounds and gestures in the presence of the Company's black or African American employees on more than one occasion.

106. During Mr. Campbell's employment at the Company, Nick Gebert's imitations of a monkey's physical sounds and gestures were directed at the Company's black or African American employees.

107. During Mr. Campbell's employment at the Company, Nick Gebert imitated a monkey's physical sounds and gestures in the presence of the Company's black or African American employees because those employees were black or African American.

108. During Mr. Campbell's employment at the Company, Nick Gebert did not imitate a monkey's physical sounds and gestures in the presence of the Company's white or Caucasian employees because those employees were white or Caucasian.

109. During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "nigger" on more than one occasion.

110. Chris Gebert called Mr. Campbell a "nigger" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

111. During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "dumb nigger" on more than one occasion.

112. Chris Gebert called Mr. Campbell a "dumb nigger" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

113.     During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Fulton a "monkey" on more than one occasion.

114.     Chris Gebert called Mr. Campbell a "monkey" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

115.     During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "porch monkey" on more than one occasion.

116.     Chris Gebert called Mr. Campbell a "porch monkey" during Mr. Campbell's employment at the Company because Mr. Campbell's race was black or African American.

117.     During Mr. Campbell's employment at the Company, Chris Gebert imitated a monkey's physical sounds and gestures in Mr. Campbell's presence on more than one occasion.

118.      During Mr. Campbell's employment at the Company, Chris Gebert's imitations of a monkey's physical sounds and gestures, were directed at Mr. Campbell.

119.     During Mr. Campbell's employment at the Company, Chris Gebert imitated a monkey's physical sounds and gestures in Mr. Campbell's presence because Mr. Campbell was black or African American.

120.     During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "niggers" on more than one occasion.

121.     During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "niggers" because those black or African American employees, other than Mr. Campbell, were black or African American.

122.     During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "niggers."

123.     During Mr. Campbell's employment at the Company, Chris Gebert did not call its

white or Caucasian employees "niggers" because those white or Caucasian employees were not black or African American.

124.    During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "dumb niggers" on more than one occasion.

125.    During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "dumb niggers" because those black or African American employees, other than Mr. Campbell, were black or African American.

126.    During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "dumb niggers."

127.    During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "dumb niggers" because those white or Caucasian employees were not black or African American.

128.    During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "monkeys" on more than one occasion.

129.    During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "monkeys" because those black or African American employees, other than Mr. Campbell, were black or African American.

130.    During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "monkeys."

131.    During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "monkeys" because those white or Caucasian employees were not black or African American.

132. During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "porch monkeys" on more than one occasion.

133. During Mr. Campbell's employment at the Company, Chris Gebert called its black or African American employees, other than Mr. Campbell, "porch monkeys" because those black or African American employees, other than Mr. Campbell, were black or African American.

134. During Mr. Campbell's employment at Defendant, Chris Gebert did not call its white or Caucasian employees "porch monkeys."

135. During Mr. Campbell's employment at the Company, Chris Gebert did not call its white or Caucasian employees "porch monkeys" because those white or Caucasian employees were not black or African American.

136. During Mr. Campbell's employment at the Company, Chris Gebert imitated a monkey's physical sounds and gestures in the presence of the Company's black or African American employees on more than one occasion.

137. During Mr. Campbell's employment at the Company, Chris Gebert's imitations of a monkey's physical sounds and gestures, were directed at the Company's black or African American employees.

138. During Mr. Campbell's employment at the Company, Chris Gebert imitated a monkey's physical sounds and gestures in the presence of the Company's black or African American employees because those employees were black or African American.

139. During Mr. Campbell's employment at the Company, Chris Gebert did not imitate a monkey's physical sounds and gestures in the presence of the Company's white or Caucasian employees because those employees were white or Caucasian.

140.    During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "nigger" weekly, sometimes daily.

141.    During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "dumb nigger" weekly, sometimes daily.

142.    During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "monkey" weekly, sometimes daily.

143.    During Mr. Campbell's employment at the Company, Nick Gebert called Mr. Campbell a "porch monkey" weekly, sometimes daily.

144.    During Mr. Campbell's employment at the Company, Nick Gebert occasionally imitated a monkey's physical sounds and gestures in the presence of Mr. Campbell.

145.    During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "nigger" weekly, sometimes daily.

146.    During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "dumb nigger" weekly, sometimes daily.

147.    During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "monkey" weekly, sometimes daily.

148.    During Mr. Campbell's employment at the Company, Chris Gebert called Mr. Campbell a "porch monkey" weekly, sometimes daily.

149.    During Mr. Campbell's employment at the Company, Chris Gebert acted like a monkey by imitating a monkey's physical sounds and gestures, in the presence of Mr. Campbell weekly, sometimes daily.

150.    In approximately November or December 2008, Chris Gebert called President Obama a "nigger" in the presence of Mr. Campbell when he saw President Obama on the front

page of a newspaper at the Company.

151.    In approximately November or December 2008, Chris Gebert stated, "We've got a nigger in office," in front of and in the presence of Mr. Campbell when referencing that President Obama had recently been elected President of the United States.

152.    In approximately November or December 2008, Chris Gebert stated, "He should've been assassinated," in front of and in the presence of Mr. Campbell when referring to President Obama.

153.    In approximately November or December 2008, Chris Gebert, after seeing President Obama on the front page of a newspaper at Defendant, threw the newspaper on the ground and spit on it in front of/in the presence of Mr. Campbell.

154.    During Mr. Campbell's employment at the Company, Nick Gebert swore, cussed, or cursed at Defendant Gebert.

155.    During Mr. Campbell's employment at the Company, Nick Gebert yelled at Defendant Gebert.

156.    During Mr. Campbell's employment at the Company, Nick Gebert told Defendant Gebert, "fuck you," or "fuck off," or words to that effect.

157.    During Mr. Campbell's employment at the Company, Nick Gebert called Defendant Gebert a "bitch," or a "stupid bitch," or words to that effect.

158.    During Mr. Campbell's employment at the Company, Chris Gebert swore, cussed, or cursed at Defendant Gebert.

159.    During Mr. Campbell's employment at the Company, Chris Gebert yelled at Defendant Gebert.

160.    During Mr. Campbell's employment at the Company, Chris Gebert told Defendant

Gebert, "fuck you," or "fuck off," or words to that effect.

161. During Mr. Campbell's employment at the Company, Chris Gebert called Defendant Gebert a "bitch," or a "stupid bitch," or words to that effect.

162. During Mr. Campbell's employment at the Company, Nick Gebert brought his gun(s) to work.

163. During Mr. Campbell's employment at the Company, Nick Gebert, and in the presence of his gun(s) at work, called Mr. Campbell a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or acted like a monkey by imitating a monkey's physical sounds and gestures.

164. During Mr. Campbell's employment at the Company, Chris Gebert brought his gun(s) to work.

165. During Mr. Campbell's employment at the Company, Chris Gebert, and in the presence of his gun(s) at work, called Mr. Campbell a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or acted like a monkey by imitating a monkey's physical sounds and gestures.

166. During Mr. Campbell's employment at the Company, other employees witnessed Nick Gebert, on numerous occasions, call Mr. Campbell a "nigger," a "dumb nigger," a "monkey," a "porch monkey," and/or imitate a monkey's physical sounds and gestures.

167. During Mr. Campbell's employment at the Company, other employees witnessed Chris Gebert, on numerous occasions, call Mr. Campbell a "nigger," a "dumb nigger," a "monkey," a "porch monkey," and/or imitate a monkey's physical sounds and gestures.

168. During Mr. Campbell's employment at the Company, another employee witnessed Nick Gebert and Chris Gebert call Mr. Campbell "a yard ape."

169. During Mr. Campbell's employment at the Company, another employee witnessed Chris Gebert call Mr. Campbell "Toby" and "Kunta," a reference to the central character of the

television series "Roots" who was a slave from Africa.

170. During Mr. Campbell's employment with the Company, Nick Gebert and/or Chris Gebert routinely told Mr. Campbell in a derogatory and threatening tone, "Go back where you came from." Comments like this were in reference to Mr. Campbell's race, and Nick Gebert and/or Chris Gebert did not make comments like this to the Company's white or Caucasian employees.

171. During Mr. Campbell's employment at the Company, another employee witnessed Nick Gebert and Chris Gebert make racially-stereotypical references to fried chicken, watermelon and grape Kool-Aid, asking Mr. Campbell such things as, "Isn't that what you monkeys eat?"

172. During Mr. Campbell's employment at the Company, at least one other employee witnessed Nick Gebert and Chris Gebert yell out in the workplace that they, "Hate all niggers!"

173. During Mr. Campbell's employment at the Company, at least one other employee witnessed Nick Gebert and Chris Gebert yell out in the workplace, "All fucking niggers must fucking hang!"

174. During Mr. Campbell's employment at the Company, Nick Gebert and/or Chris Gebert physically threw the Company's product at Mr. Campbell.

175. During Mr. Campbell's employment at the Company, Nick Gebert and/or Chris Gebert physically threw the Company's product at Mr. Campbell because Mr. Campbell was black or African American.

176. During Mr. Campbell's employment at the Company, Nick Gebert and/or Chris Gebert did not physically throw the Company's product at its white or Caucasian employees.

177. During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert and/or Chris Gebert physically threw the Company's product at Mr. Campbell. Defendant Gebert did nothing in response.

178.    During Mr. Campbell's employment at the Company, Chris Gebert physically threw a piece of plastic at Mr. Campbell, which hit him Mr. Campbell in the lip causing it to bleed.  Mr. Campbell reported this to Defendant Gebert.  Defendant Gebert did nothing in response.

179.    During Mr. Campbell's employment at the Company, Chris Gebert physically threw a piece of cardboard at Mr. Campbell, which hit him Mr. Campbell above his eye, causing it to bleed.  Mr. Campbell reported this to Defendant Gebert.  Defendant Gebert did nothing in response.

180.    During Mr. Campbell's employment at the Company, Nick Gebert and/or Chris Gebert would often hide the forklift keys from Mr. Campbell so that Mr. Campbell could not work during the work day.  Nick Gebert and/or Chris Gebert admitted to Mr. Campbell and to Defendant Gebert that they did this.  Defendant Gebert did nothing in response.

181.    Defendant Gebert allowed Nick Gebert and/or Chris Gebert to work more hours per week than Mr. Campbell, allowed Nick Gebert and/or Chris Gebert to take their timecards home, and allowed Nick Gebert and/or Chris Gebert to hunt while they were "on the clock" and supposed to be working at the Company.  Defendant Gebert did not afford these benefits to Mr. Campbell.

182.    During Mr. Campbell's employment at the Company and when Mr. Fulton was not at work at the Company, Nick Gebert and/or Chris Gebert often told Mr. Campbell, "You can't tell us what to do nigger because our mom runs the place," or words to that effect.  Mr. Campbell reported this to Defendant Gebert, who did nothing in response.

### Mr. Campbell's Complaints of Racial Discrimination and Racial Harassment to Defendant Gebert, Defendant Cassai, Defendant Golper, and Leo Golper

183.    During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert had called him a "nigger."

184.    During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert had called him a "dumb nigger."

185.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert had called him a "monkey."

186.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert had called him a "porch monkey."

187.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Nick Gebert had imitated a monkey's physical sounds and gestures, in front of him and in his presence.

188.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Nick Gebert had called him a "nigger."

189.     During Mr. Campbell employment at the Company, Mr. Campbell complained to Defendant Cassai that Nick Gebert had called him a "dumb nigger."

190.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Nick Gebert had called him a "monkey."

191.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Nick Gebert had called him a "porch monkey."

192.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Nick Gebert had imitated a monkey's physical sounds and gestures, in front of him and in his presence.

193.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Nick Gebert had called him a "nigger."

194.     During Mr. Campbell employment at the Company, Mr. Campbell complained to Defendant Golper that Nick Gebert had called him a "dumb nigger."

195.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to

Defendant Golper that Nick Gebert had called him a "monkey."

196.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Nick Gebert had called him a "porch monkey."

197.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Nick Gebert had imitated a monkey's physical sounds and gestures, in front of him and in his presence.

198.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Leo Golper that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," and acted like a monkey by imitating a monkey's physical sounds and gestures.

199.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Chris Gebert had called him a "nigger."

200.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Chris Gebert had called him a "dumb nigger."

201.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Chris Gebert had called him a "monkey."

202.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Chris Gebert had called him a "porch monkey."

203.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Gebert that Chris Gebert had imitated a monkey's physical sounds and gestures, in front of him and in his presence.

204.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Chris Gebert had called him a "nigger."

205.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to

Defendant Cassai that Chris Gebert had called him a "dumb nigger."

206.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Chris Gebert had called him a "monkey."

207.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Chris Gebert had called him a "porch monkey."

208.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai that Chris Gebert had imitated a monkey's physical sounds and gestures in front of him and in his presence.

209.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Chris Gebert had called him a "nigger."

210.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Chris Gebert had called him a "dumb nigger."

211.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Chris Gebert had called him a "monkey."

212.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Chris Gebert had called him a "porch monkey."

213.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper that Chris Gebert had imitated a monkey's physical sounds and gestures in front of him and in his presence.

214.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to Leo Golper that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," and acted like a monkey by imitating a monkey's physical sounds and gestures.

215.     During Mr. Campbell's employment at the Company, Mr. Campbell complained to

Defendant Gebert almost daily that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

216.    During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Defendant Gebert that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence, Mr. Campbell told Defendant Gebert that Chris Gebert's comments upset and offended him.

217.    During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai at least weekly, that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

218.    During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Defendant Cassai that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence, Mr. Campbell told Defendant Cassai that Nick Gebert's comments upset and offended him.

219.    During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Cassai at least weekly that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

220.    During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Defendant Cassai that Chris Gebert had called him a "nigger," a "dumb nigger," a

"monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence Mr. Campbell, told Defendant Cassai that Chris Gebert's comments upset and offended him.

221. During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper at least weekly, that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

222. During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Defendant Golper that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence, Mr. Campbell told Defendant Golper that Nick Gebert's comments upset and offended him.

223. During Mr. Campbell's employment at the Company, Mr. Campbell complained to Defendant Golper at least weekly that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

224. During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Defendant Golper that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence Mr. Campbell, told Defendant Golper that Chris Gebert's comments upset and offended him.

225. During Mr. Campbell's employment at the Company, Mr. Campbell complained to Leo Golper at least weekly, that Nick Gebert had called him a "nigger," a "dumb nigger," a

"monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

226.    During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Leo Golper that Nick Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence, Mr. Campbell told Leo Golper that Nick Gebert's comments upset and offended him.

227.    During Mr. Campbell's employment at the Company, Mr. Campbell complained to Leo Golper at least weekly that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence.

228.    During Mr. Campbell's employment at the Company and when Mr. Campbell complained to Leo Golper that Chris Gebert had called him a "nigger," a "dumb nigger," a "monkey," a "porch monkey," or imitated a monkey's physical sounds and gestures in front of him and in his presence Mr. Campbell, told Leo Golper that Chris Gebert's comments upset and offended him.

229.    During Mr. Campbell's employment at the Company, the Company determined that Nick Gebert had engaged in racial discrimination against Mr. Campbell.

230.    During Mr. Campbell's employment at the Company, the Company determined that Nick Gebert had engaged in racial harassment against Mr. Campbell.

231.    During Mr. Campbell's employment at the Company, the Company determined that Chris Gebert had engaged in racial discrimination against Mr. Campbell.

232.    During Mr. Campbell's employment at the Company, the Company determined that

Chris Gebert had engaged in racial harassment against Mr. Campbell.

233.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Gebert told Nick Gebert to "stop."

234.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Gebert told Chris Gebert to "stop."

235.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Golper told Nick Gebert to "stop."

236.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Golper told Chris Gebert to "stop."

237.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Gebert told Nick Gebert to apologize to Mr. Campbell.

238.    In response to Mr. Campbell's complaints of racial discrimination and racial harassment, Defendant Gebert told Chris Gebert to apologize to Mr. Campbell.

239.    During Mr. Campbell's employment at the Company, Nick Gebert did not receive verbal discipline for engaging in racial harassment or racial discrimination against Mr. Campbell.

240.    During Mr. Campbell's employment at the Company, Nick Gebert did not receive written discipline for engaging in racial harassment or racial discrimination against Mr. Campbell.

241.    During Mr. Campbell's employment at the Company, Chris Gebert did not receive verbal discipline for engaging in racial harassment or racial discrimination against Mr. Campbell.

242.    During Mr. Campbell's employment at the Company, Chris Gebert did not receive written discipline for engaging in racial harassment or racial discrimination against Mr. Campbell.

243.    On or about October 16, 2008, Mr. Campbell and Mr. Fulton complained to Defendant Cassai that Chris Gebert had called him a "nigger" and a "monkey."

244.    On or about October 16, 2008, Mr. Campbell and Mr. Fulton, in Defendant Cassai's presence, complained to Leo Golper that Chris Gebert had called him a "nigger" and a "monkey."

245.    On or about October 16, 2008, Leo Golper terminated Chris Gebert's employment at Defendant because of Chris Gebert's racially discriminatory behavior towards Mr. Fulton and Mr. Campbell.

246.    On or about October 17, 2008, Chris Gebert return to work at Defendant Company.

247.    On or about December 15, 2009, Mr. Campbell and Mr. Fulton complained to Defendant Gebert and Leo Golper that Chris Gebert had called both Mr. Campbell and Mr. Fulton "niggers" and "monkeys."

248.    On or about December 16, 2009, Mr. Campbell and Mr. Fulton complained to Defendant Cassai that Chris Gebert had called both Mr. Campbell and Mr. Fulton "niggers" and "monkeys."

249.    On or about December 16, 2009, Mr. Campbell and Mr. Fulton complained to Defendant Cassai that Chris Gebert had called both Mr. Campbell and Mr. Fulton "niggers" and "monkeys" and that both Mr. Campbell and Mr. Fulton "wanted something done."

250.    On or about December 16, 2009, Mr. Campbell, Mr. Fulton, Defendant Golper, Defendant Gebert, and Chris Gebert met to discuss Chris Gebert calling both Mr. Campbell and Mr. Fulton "niggers" and "monkeys" ("the December 16, 2009 meeting").

251.    During the December 16, 2009 meeting, Chris Gebert admitted to Defendants Golper and Gebert that he had called Mr. Campbell and Mr. Fulton "niggers" and "monkeys."

252.    During the December 16, 2009 meeting, Defendant Gebert told Chris Gebert to apologize to Mr. Campbell and Mr. Fulton and to "[c]onfirm[] it would not occur again."

253.    On or about December 21, 2009, the Company posted a document, dated December

21, 2009 and titled "Employee Notice," in its break room.

254.    The December 21, 2009 "Employee Notice" document that the Company posted in its break room, stated: "If you engage in swearing, cussing or racial remarks with any employee or supervisor you will be released of your job duties immediately."

255.    The December 21, 2009 "Employee Notice" document that the Company posted in its break room and regarding engaging in swearing, cussing, or racial remarks in the workplace, stated: "This behavior leads to a very unhealthy environment and it will not be tolerated any longer."

256.    The December 21, 2009 "Employee Notice" document that the Company posted in its break room and regarding engaging in swearing, cussing, or racial remarks in the workplace did not curb, deter, or in any way remedy, prevent, or stop Nick Gebert and/or Chris Gebert from racially discriminating, racially harassing, and/or retaliating against Mr. Campbell.

257.    Upon information and belief and during Mr. Campbell's employment at the Company, Defendant Cassai told Defendant Gebert that the Company should terminate Nick Gebert because of his racial discrimination and racial harassment of Mr. Campbell.

258.    Upon information and belief and during Mr. Fulton's employment at the Company, Defendant Cassai told Defendant Gebert that the Company should terminate Chris Gebert because of his racial discrimination and racial harassment of Mr. Campbell.

259.    During Mr. Campbell's employment at the Company, and after one of his complaints of racial discrimination and racial harassment to Defendant Golper, Defendant Golper told Mr. Campbell, "I'll take care of it," or words to that effect.

260.    During Mr. Campbell's employment at the Company, and after one of his complaints of racial discrimination and racial harassment to Defendant Golper, Defendant

Golper told Mr. Campbell, "I'll make it better when I take over," or words to that effect.

261.     Other employees of the Company were aware that Mr. Campbell complained to Defendant Gebert on multiple occasions about Nick Gebert's and Chris Gebert's racial discrimination and racial harassment.

262.     Other employees of the Company were aware that Mr. Campbell complained to Defendant Cassai on multiple occasions about Nick Gebert's and Chris Gebert's racial discrimination and racial harassment.

263.     Other employees of the Company were aware that Mr. Campbell complained to Defendant Golper on multiple occasions about Nick Gebert's and Chris Gebert's racial discrimination and racial harassment.

264.     Other employees of the Company were aware that Mr. Campbell complained to Leo Golper on multiple occasions about Nick Gebert's and Chris Gebert's racial discrimination and racial harassment.

265.     Other employees of the Company were aware that, in response to Mr. Campbell's multiple complaints of racial discrimination and racial harassment to Defendant Gebert, Defendant Gebert did nothing.

266.     Other employees of the Company were aware that, in response to Mr. Campbell's multiple complaints of racial discrimination and racial harassment to Defendant Cassai, Defendant Cassai did nothing.

267.     Other employees of the Company were aware that, in response to Mr. Campbell's multiple complaints of racial discrimination and racial harassment to Defendant Golper, Defendant Golper did nothing.

268.     Other employees of the Company were aware that, in response to Mr. Fulton's

multiple complaints of racial discrimination and racial harassment to Leo Golper, Leo Golper did nothing.

269.     Other employees of the Company have characterized Defendant Gebert, Defendant Golper, and Leo Golper as condoning racial discrimination and racial harassment in the workplace.

270.     During Mr. Campbell's employment at the Company, it was common knowledge throughout the Company that employee complaints to the Company about racial discrimination and/or racial harassment in the workplace were pointless because the Company would not remedy, rectify, or even address that racial discrimination and/or racial harassment had occurred or was occurring.

271.     During Mr. Campbell's employment at the Company, it was common practice for the Company's employees to refrain from complaining to the Company about racial discrimination and/or racial harassment for fear of retaliation.

**Defendant Company's Discriminatory and Retaliatory Termination of Mr. Campbell**

272.     On or about August 31, 2010, and tired of the constant and continued racial discrimination and racial harassment he was experiencing in the workplace at the Company and the fact that the Company was doing nothing to remedy or curb same, Mr. Campbell walked off the job.

273.     At the time that Mr. Campbell was leaving Defendant Company's workplace on or about August 31, 2010, he heard Chris Gebert state, "We got rid of one," or words to that effect.

274.     On or about September 2, 2010, Mr. Campbell physically returned to the Company to pick up his final paycheck.

275.     On or about September 2, 2010, and when Mr. Campbell physically returned to the Company to pick up his final paycheck, he ran into and had a conversation with Leo Golper.

276. On or about September 2, 2010, and during his conversation with Leo Golper, Mr. Campbell explained why he had walked away from the job on or about August 31, 2010: because he was tired of the constant and continued racial discrimination and racial harassment he was experiencing in the workplace at the Company, and the fact that the Company was doing nothing to remedy or curb same. In response, Leo Golper told Mr. Campbell to return to work at the Company on or about September 7, 2010, following the Labor Day weekend. Mr. Campbell agreed.

277. On or about September 3, 2010, Defendant Gebert called Mr. Campbell and told him not to report to work at the Company on or about September 7, 2010 "because you're not needed," or words to that effect.

278. On or about the morning of September 7, 2010, Mr. Campbell called Leo Golper at the Company. Defendant Gebert answered the phone call and told Mr. Campbell that he could not speak with Leo Golper because he was not there. Mr. Campbell then called Mr. Fulton, who told Mr. Campbell that not only was Leo Golper present at the Company, but also that Mr. Fulton was looking directly at him. Mr. Campbell hung up the phone with Mr. Fulton and again tried calling Leo Golper. Defendant Gebert again answered the phone call and told Mr. Campbell that he could not speak with Leo Golper.

279. Beginning on or about the morning of September 7, 2010 and continuing for approximately the following three weeks, Ms. Campbell called Defendant Company each day to speak with Leo Golper. Each time, no one answered or Defendant Gebert told Mr. Campbell that Leo Golper was not there or not available and not to call back or return to work at the Company.

280. Mr. Campbell did not return to work at the Company; his last day of work was on or about August 31, 2010.

281. At the time of his termination, Mr. Campbell earned $10.25 per hour and was

working approximately 24 to 32 hours per week.

<u>**Defendant Company's Discriminatory and Retaliatory Treatment and Termination of Another Similarly-Situated Employee**</u>

282.   The Company, specifically Defendant Gebert, hired Eric Franklin as a General Laborer from approximately August 2008 to on or about October 24, 2008.

283.   Franklin's race is white or Caucasian.

284.   Franklin's wife's race is Hispanic.

285.   During Franklin's employment with the Company, Chris Gebert knew that Franklin's wife's race was Hispanic.

286.   On one occasion during Franklin's employment with the Company, Franklin was in the Company's lunch room talking to Mr. Fulton and another employee.  Chris Gebert overheard the conversation and yelled at Franklin, "Your wife probably just married your ass so she could get a green card," or words to that effect. Chris Gebert then called Franklin's wife, "a stupid 'spic'." Enraged, Franklin immediately went to Defendant Gebert and complained about Chris Gebert's racist comments about his wife.  Franklin further told Defendant Gebert that if she did not rectify the situation, he would file a harassment complaint or call the police.  In response, Defendant Gebert did nothing.

287.   When Chris Gebert's racial discrimination and racial harassment did not cease, Franklin again complained to Defendant Gebert, who stated, "Oh, well I'll talk to them," and that she could not watch Chris Gebert or Nick Gebert all day and had things to do in the office.

288.   Within weeks of complaining to Defendant Gebert about her sons' racial discrimination and racial harassment at the Company, Defendant Gebert terminated Franklin on or about October 24, 2008 claiming that "work was slow."

289.   Defendant Gebert hired another individual to replace Franklin within days after

terminating Franklin on or about October 24, 2008.

**Nick Gebert's and Chris Gebert's Continued Employment at Defendant Company after Mr. Campbell's Termination and the Eventual End of their Employment**

290.     On or about September 27, 2011, an employee of the Company, David Kroeger, white or Caucasian, complained to Defendant Cassai that Chris Gebert had called another black or African American employee of the Company, Otis McIntosh, a racial slur.

291.     Prior to Kroeger's complaint on or about September 27, 2011, the Company received notice that Mr. Fulton and Mr. Campbell had filed employment discrimination complaints against the Company with the Department of Workforce Development – Equal Rights Division.

292.     On or about September 27, 2011, and after receiving Kroeger's complaint that Chris Gebert had called McIntosh a racial slur, Defendant Cassai spoke to Leo Golper and Defendant Gebert.

293.     On or about September 27, 2011, the Company determined that Chris Gebert had called McIntosh a racial slur.

294.     On or about September 27, 2011, the Company gave Chris Gebert a warning for calling McIntosh a racial slur.

295.     Upon information and belief, the Company's September 27, 2011 discipline of Chris Gebert for calling McIntosh a racial slur was the first formal discipline Chris Gebert received during his employment at the Company.

296.     On or about September 27, 2011, the Company suspended Chris Gebert for three days and ordered him to take a "Workplace Cultural Sensitivity" class because he called McIntosh a racial slur.

297.     On or about October 3, 2011, Chris Gebert completed a "Workplace Cultural Sensitivity" class and received a certificate, dated October 3, 2011.

298.    On or about October 18, 2011, Defendant Golper met with Nick Gebert, Chris Gebert, and four other employees of the Company: McIntosh, Cliff Wichman, Joe (last name unknown), and Seth (last name unknown) ("the October 18, 2011 meeting").

299.    Defendant Golper took notes during the October 18, 2011 meeting.

300.    Defendant Golper's notes from the October 18, 2011 meeting, consisted of words and phrases, including: "Plant staff"; "Blow up"; "Mellow up"; "No hollering"; "No swearing"; "Patience"; "Calm"; "Communication"; "Attitude"; "Respect"; "Chris + Nick knowledgeable"; "Teamwork"; "That's how plant will be evaluated"; "Had to talk to Jason, Joe, Otis, Seth, Cliff"; "No teamwork"; "Holler, yell, no patience"; "Testosterone"; "Slow down"; "Patient"; and the word "Complaint" with a large star by it.

301.    In approximately April 2012, Defendant Golper wrote the following notes regarding a conversation he had with Defendant Gebert:

> Some of Jane's comments relative to Boys/Discrimination/Suit. April area. Chris wanted his $50 back for fee for taking the sensitivity training. Some people in plant giving Chris rough time. For sure Chris was the instigator. Jane getting a hard time from Chris. She argued company's [sic] who require classes get their fees reimbursed. Told Jane NO WAY. It was either take the class or not come back to work. Jane offered to pay us $50 if we fronted the check to Chris. Chris out of control; apparently out of control for parents also. At this time Jane admited [sic] when Chris had incident with Otis; it would have been best to fire him at that time.

302.    On or about June 1, 2012, the Company received notice that the Department of Workforce Development – Equal Rights rendered Initial Determinations of Probable Cause to Mr. Fulton and Mr. Campbell.

303.    On or about July 16, 2012, Defendants Golper, Gebert, and Cassai had a meeting with Chris Gebert.

304.    The Company summarized in writing the meeting on or about July 16, 2012

between Defendants Golper, Gebert, Cassai, and Chris Gebert and dated these notes "7-16-12."

305.    The Company's notes from the meeting on or about July 16, 2012 between Defendants Golper, Gebert, Cassai, and Chris Gebert were titled, "Re: Chris Gebert Termination/Resignation."

306.    The Company's notes regarding the meeting on or about July 16, 2012 state in full:

> 7-16-12    David and Faye discussed Chris Gebert should resign his position at Golper Supply. Jane Gebert joined the meeting and was on side with Chris Resigning. We all discussed:
>
> 1    Chris's actions have been volatile in the plant and to coworkers. Some of those actions have led to very serious discrimination law suits with two former employees.
>
> 2    Chris has been out of control and therefore we cannot be comfortable in the fact that we [sic] won't act out again.
>
> 3    We feel Chris's resignation is the right thing to do and we'll give him until 7-19-12. His brother Nick who is also named in the allegations is resigning his position to start employment in the Insurance business. His last day is 7-19-12. We feel it is appropriate that they leave at the same time.

307.    The Company's notes regarding the meeting on or about July 16, 2012 were electronically signed by Defendants Golper and Cassai.

308.    On or about July 18, 2012, Defendants Golper, Gebert, and Cassai had a meeting.

309.    During the meeting on or about July 18, 2012, Defendants Golper, Gebert, and Cassai discussed Chris Gebert and Nick Gebert.

310.    The Company summarized in writing the meeting on or about July 18, 2012 between Defendants Golper, Gebert, and Cassai, and dated those notes "7-18-12."

311.    The Company's notes regarding the meeting on or about July 18, 2012 state in full:

> 7-18-12    Jane informed me that Chris quit/resigned on 7-16

Nick gave 1-2 weeks notice. Notice was OK. Not sudden, but Jane did indicate he wasn't that interested in training a new employee. Jane indicated Nick had some left over resentments from 6 years ago when Robbie (I believe) walked out and didn't train him. Apparently Nick did leave some notes/diagrams for the next person to help him with the job.

Overall thoughts

Nick – Fixable          Chris – Not Fixable

At time over the years the boys were helpful, but in the last 2-3 years. [sic] Chris was totally out of control, and both boys were difficult to work with. The tough part is that through their hostile actions to co-workers and our inability to control them, the boys will end up having a rather significant negative impact to Golper Supply financially. The good part is that going forward without the boys, the work environment will be much improved for everyone involved.

312. The Company's writings regarding the meeting on or about July 18, 2012 were electronically signed by Defendants Golper and Cassai.

313. On or about July 19, 2012, Nick Gebert's employment with Defendant ended.

314. On or about July 19, 2012, Chris Gebert's employment with Defendant ended.

**FIRST CAUSE OF ACTION – 42 U.S.C. § 1981 RACE DISCRIMINATION**

315. Mr. Campbell re-alleges and incorporates paragraphs 1 – 314 of this complaint by reference.

316. Defendants intentionally harassed Mr. Campbell, discriminated against Mr. Campbell, and subjected Mr. Campbell to a hostile work environment on the basis of his race, black or African American, in the terms and conditions of his employment and/or by terminating Mr. Campbell's employment in reckless disregard for his federally protected rights under 42 U.S.C. § 1981.

317.	As a result of Defendants' intentional violation of 42 U.S.C. § 1981, Mr. Campbell has suffered damages in the form of lost wages, employment benefits and insurance, future lost earning capacity, physical, mental and emotional distress, humiliation, and loss of reputation.

318.	Defendants' conduct as complained of herein was intentional, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiff's rights and, accordingly, Plaintiff is entitled to recovery of punitive damages from Defendants.


**SECOND CAUSE OF ACTION – 42 U.S.C. § 1981 RETALIATION**

319.	Mr. Campbell re-alleges and incorporates paragraphs 1 – 318 of this complaint by reference.

320.	Defendants intentionally retaliated against Mr. Campbell on the basis of his race (black or African American), for opposing discrimination and/or harassment in the workplace, and/or for enforcing his statutory rights in the terms and conditions of his employment and/or by terminating his employment in reckless disregard for his federally protected rights under 42 U.S.C. § 1981.

321.	As a result of Defendants' intentional violation of 42 U.S.C. § 1981, Mr. Campbell has suffered damages in the form of lost wages, employment benefits and insurance, future lost earning capacity, physical, mental and emotional distress, humiliation, and loss of reputation.

322.	Defendants' conduct as complained of herein was intentional, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiff's rights and, accordingly, Plaintiff is entitled to recovery of punitive damages from Defendants.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendants to make Plaintiff whole by providing appropriate back pay, other employment benefits and insurance, front pay and/or reinstatement, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff his attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable, including declaratory or injunctive relief.


**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**


Dated this 15th day of April, 2013.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff


**s/ _James A. Walcheske_ _____**
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405


WALCHESKE & LUZI, LLC
200 South Executive Drive, Suite 101
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 789-6699
jwalcheske@walcheskeluzi.com
sluzi@walcheskeluzi.com